UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

**DOROTHY A. LIEGEL**
       **Plaintiff,**

  v.                                                **Case No. 12-C-209**

**CAROLYN W. COLVIN,[1]**
**Acting Commissioner of the Social Security Administration**
       **Defendant.**

---

### DECISION AND ORDER

Plaintiff Dorothy Liegel seeks judicial review of the denial of her application for social security disability benefits. Plaintiff alleged inability to work due to a variety of impairments, including sacroilitis, knee pain, and depression, but the Social Security Administration ("SSA") denied her application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. After the Appeals Council denied review, the ALJ's decision became the final word from the agency on plaintiff's application. See Pepper v. Colvin, 712 F.3d 351, 361 (7th Cir. 2013).

Because the ALJ overlooked important evidence supporting plaintiff's claim and failed to provide an adequate explanation for his rejection of her treating physicians' opinions, the matter must be remanded for further proceedings. The Commissioner attempts to bolster the ALJ's decision with additional reasoning, but my review is limited to the rationale articulated by the ALJ.

---

[1] The court substitutes Carolyn Colvin as defendant pursuant to Fed. R. Civ. P. 25(d).

# I.   FACTS AND BACKGROUND

**A.   Medical Evidence**

    **1.   Treatment Records**[2]

In November 2009, plaintiff sought treatment for back and leg pain, which her doctors treated conservatively with pain medication and physical therapy. (Tr. at 521-32.) X-rays and examination findings were essentially normal, and Martine Banda-Wolk, APNP, diagnosed L-S sprain/strain with radiculopathy. (Tr. at 461, 522.) By the following month, plaintiff reported improvement and returned to work, first for three and one-half hours and then six hours per day. (Tr. at 516-20.)

In April 2010, plaintiff sought treatment for knee pain. X-rays were normal, and on exam plaintiff's providers, including NP Banda-Wolk, found her pain complaints out of proportion to the objective findings, recommending symptomatic treatment with ibuprofen and ice. (Tr. at 499, 502-04, 507, 639.) However, an orthopedist, Dr. Thomas Beck, ordered an MRI, which revealed a meniscal tear, and in May 2010 Dr. Beck performed a left knee arthroscopy. (Tr. at 456-60, 497, 638.)

Plaintiff recovered well from the knee surgery, but she continued to complain of debilitating back pain radiating from the buttocks down her leg, for which her primary care physician, Dr. Bryan Myers, prescribed Lyrica and Neurontin and recommended continued physical therapy. (Tr. at 479, 481, 483, 485, 487, 491, 493.) In June 2010, Dr. Myers ordered a lumbar spine MRI, which revealed no significant abnormality. (Tr. at 455.) On July 26, 2010,

---

[2]Although the administrative record contains a substantial amount of historical medical evidence, because plaintiff in the instant application alleged a disability onset date of July 22, 2010, I will focus on the records from that general time period. I will also focus on the impairments she currently claims disable her.

Dr. Myers indicated that plaintiff could return to work for a two hour shift, followed by thirty minutes of rest and then another two hour shift, but her employer, a supermarket, indicated that it could not accommodate those restrictions; plaintiff had to work a full three and one-half hour shift and would not be taken back until she could. (Tr. at 475.)

In August 2010, plaintiff advised Dr. Myers that she had left her job at the supermarket and was working part-time as a waitress. She reported no pain relief from therapy, medications, or chiropractic treatment, and in the fall of 2010 Dr. Myers referred her to a pain management clinic and started her on Effexor for depression. (Tr. at 468, 472, 588.)

On December 2, 2010, plaintiff saw Dr. Nalini Sehgal at the pain clinic. Dr. Sehgal scheduled plaintiff for an SI joint injection, prescribed Relafen for pain, and started her on physical therapy. (Tr. at 571-72.) Dr. Sehgal also completed a return to work report, indicating that plaintiff was capable of sedentary work. Dr. Sehgal further wrote: "Patient is able to work for up to 2 hours at a time, then need[s] 2 hours off. New treatment is starting and re-evaluation will be performed in about 1 month to readdress work restrictions and progress in her treatment." (Tr. at 574.)

On December 28, 2010, plaintiff reported that the therapy exercises were too strenuous and caused unbearable pain. She further reported that the Relafen provided no benefit. (Tr. at 656.) On January 20, 2011, Dr. James Leonard performed an SI joint injection, which also provided no relief. (Tr. at 582, 735.)

On February 7, 2011, plaintiff returned to Dr. Sehgal, indicating that her pain had not improved. Dr. Sehgal provided a trial of Tramadol. (Tr. at 652.) Two days later, plaintiff was discharged from physical therapy due to non-compliance with appointments. (Tr. at 651.) On February 20, 2011, plaintiff saw Kristyn Hare, PA, and Dr. Sehgal at the pain clinic, reporting

that the Tramadol did not work either. At that point, Dr. Sehgal suspected the pain most likely related to soft tissue damage from an injury or ligament injury, possibly with an element of piriformis syndrome. She provided a trial of Baclofen as a muscle relaxer. (Tr. at 647-49.) On February 28, plaintiff advised that her former employer would not permit return to work unless she could complete a three and one-half hour shift, which exceeded her current restriction of two hours on, two hours off. She further reported that the Baclofen took the edge off her pain. (Tr. at 644.) In March 2011, plaintiff elected to transfer her pain management care to Dr. Douglas Keehn, as his office was closer to her home. (Tr. at 643.)

On March 18, 2011, plaintiff saw NP Banda-Wolk for anxiety and depression. She reported taking Alprazolam (Xanax) and Effexor. She indicated that she could not take the Baclofen because it made her dizzy. NP Banda-Wolk declined to refill Alprazolam, instead prescribing Buspar. (Tr. at 724.) On March 23, plaintiff saw Dr. Myers, complaining of significant anxiety and elevated blood pressure since she had stopped taking Xanax. Dr. Myers indicated that her withdrawal symptoms should improve over next few days. He also provided a trial of Ambien to help with sleep. (Tr. at 721-22.) By March 30, plaintiff reported that her anxiety had greatly improved but her sleep problems persisted. Dr. Myers discontinued Ambien and prescribed Trazodone. (Tr. at 719-20.)

On April 7, 2011, plaintiff returned to Dr. Myers regarding her low back pain, requesting that he complete a form for her disability claim. (Tr. at 715-16.) The April 7, 2011 report[3] indicates that plaintiff could lift a maximum of no more than ten pounds, less than ten pounds frequently; stand/walk about four hours in an eight-hour day; and sit about two hours in an

---

[3]The signature on this document is illegible, and nowhere on the form is the doctor's name printed.

eight-hour day. She could continuously sit or stand for just five minutes before changing positions. (Tr. at 693.) She needed the opportunity to shift at will from seated to standing, as well as the ability to lie down at unpredictable intervals during a work shift. As medical findings supporting these limitations, the report stated: "low back pain with minimal degenerative changes on MRI, likely sacroilitis." (Tr. at 694.) The report further indicated that plaintiff could not twist, stoop, crouch, or climb ladders, and that her ability to reach and push/pull was limited by pain. (Tr. at 694.) She had to avoid even moderate exposure to extreme cold and hazards (e.g., machinery, heights), and concentrated exposure to wetness and humidity, as she experienced increased pain with cold and humidity, and needed to avoid hazards due to slower reaction times. Finally, the report indicated that plaintiff would be absent more than three times per month due to her impairments. (Tr. at 695.)

On April 20, 2011, plaintiff saw Dr. Keehn for evaluation of her pain complaints. (Tr. at 726.) On exam, she displayed rather dramatic pain behaviors, suggestive of an inorganic source of her discomfort. She asked for pain medication, but Dr. Keehn found it difficult to justify prescribing opiates for at her at that point, as her exam revealed no abnormalities on an objective basis. Dr. Keehn ordered an EMG to rule out impingement syndrome. If nothing turned up on EMG, he would consider a single piriformis muscle injection. If that did not help, he had no further recommendations for her care. (Tr. at 727.) On May 25, 2011, plaintiff underwent the EMG, which was abnormal, indicative of left S1 radiculopthy, chronic and active. (Tr. at 768-70.)

In June 2011, plaintiff sought treatment at Advanced Pain Management for her diagnoses of neuropathy and mononeuritis. (Tr. at 759.) Her Oswestry score was 41 out of

5

54, indicating severe functional impairment.[4] Doctors prescribed Gabapentin and Cymbalta. (Tr. at 760.)

In July 2011, plaintiff sought treatment from a neurologist, Dr. Ronald Zerofsky, who indicated that plaintiff "is currently disabled because of the pain." (Tr. at 738.) Dr. Zerofsky recommended a steady increase in Gabapentin, which appeared to help somewhat. However, by mid- to late August, plaintiff began complaining of side effects, including mood swings. (Tr. at 740, 745, 744, 751.) In September 2011, Dr. Zeroksky decreased Gabapentin and prescribed Hydrocodone. (Tr. at 793, 793.)

### 2. Consultants' Reports

On November 29, 2010, a state agency reviewing physician, Pat Chan, M.D., completed a physical residual functional capacity ("RFC") assessment, finding plaintiff capable of light work with no additional limitations. (Tr. at 549-53.) Dr. Chan found Dr. Myers's assessment of the number of hours plaintiff could work worth little weight, as it appeared to be based on plaintiff's allegations, which seemed somewhat exaggerated compared to the objective findings on examinations. (Tr. at 555.)

On November 30, 2010, a state agency reviewing psychologist, Deborah Pape, Ph.D, completed a psychiatric review technique form ("PRTF"), finding that plaintiff did not have a severe mental impairment. (Tr. at 557.) Although plaintiff reported a history of depression and anxiety, this caused no more than mild limitation in her ability to function. (Tr. at 567, 569.)

On March 23, 2011, Dr. Philip Cohen completed a second physical RFC report for the

---

[4]The Oswestry score is determined based on a patient questionnaire which asks about the person's pain and ability to cope with such things as personal care, lifting, reading, driving, and recreation. Hanson v. Astrue, No. 10-C-0684, 2011 WL 1356946, at *7 n.6 (E.D. Wis. Apr. 9, 2011).

state agency, finding plaintiff capable of a full range of light work. (Tr. at 670-71, 677.) Dr. Cohen noted that the objective findings were unremarkable, that plaintiff had not followed through with physical therapy, and that at times her symptoms were not reported in a manner consistent with her presentation. Dr. Cohen also noted that she continued to work part-time as a waitress. (Tr. at 675.) Dr. Cohen found Dr. Myers's opinion limiting plaintiff to working two hours followed by a thirty minute break inconsistent with Dr. Myers's own progress notes and not well supported by the rather unremarkable objective evidence. Dr. Cohen also found Dr. Sehgal's opinion limiting plaintiff to working two hours on, two hours off, not well supported by the objective evidence. (Tr. at 676.) On March 30, 2011, Roger Rattan, Ph.D., completed a second PRTF, also finding no severe mental impairment. (Tr. at 679, 691.)

## B.   Hearing Before the ALJ

At her October 12, 2011, hearing before the ALJ, plaintiff testified that she lived with her daughter and a roommate, who paid all the bills given her lack of income. (Tr. at 71.) Plaintiff indicated that she had worked for a time after her alleged onset date of July 22, 2010, at a drive up window in a restaurant. (Tr. at 72-73.) However, she worked just one night per week, for three hours or less (Tr. at 87), and stopped doing that work because she could not stand or sit any longer (Tr. at 74). From 2008 to 2010, she worked as a cashier at a grocery store. (Tr. at 75-76.) She stopped doing that because she could no longer perform the duties. (Tr. at 76.) Prior to that, she worked at restaurants and in a factory. (Tr. at 76-77.)

Plaintiff testified that she could no longer work because she could not stand for more than ten to fifteen minutes due to pain radiating from her back down her legs. (Tr. at 78.) She further indicated that her left leg was weak and gave out at times, which required her to use a cane in her right hand. (Tr. at 82.) She testified that employers would not hire her due to the

7

breaks required by her doctor. (Tr. at 78.) She indicated that her pain started from the time she got up in the morning and got better only when she laid down on her couch. Her medications slightly helped to take the edge off. (Tr. at 79.) Her doctors gave her an injection in her back, but it did not help. (Tr. at 84.) She previously used a TENS unit for pain relief. She also performed an exercise she learned in physical therapy for pain relief. (Tr. at 85.) The therapy itself did not help with her pain so they discharged her to a home exercise program. (Tr. at 85-86.)

Plaintiff indicated that the left knee surgery helped a "little bit." (Tr. at 82-83.) She also related a diagnoses of fibromyalgia, which caused pain in other parts of her body. (Tr. at 83.) She formerly had problems with her shoulder but no longer. (Tr. 83.) She stated that her mental health problems did not significantly interfere with her functioning. (Tr. at 88.)

Plaintiff indicated that her regular doctor did not know what the problems was, but a specialist in Madison determined it was some kind of nerve disorder. (Tr. at 80.) Asked what caused the problem, plaintiff responded, "We don't know." (Tr. at 80.) Plaintiff testified that she could do limited cooking, but not dishes, vacuuming, or laundry. (Tr. at 81.) Her daughter cared for their dog. (Tr. at 82.)

The ALJ also summoned a vocational expert ("VE"), Allen Searles, who classified plaintiff's past job as a food worker as unskilled, light work; factory/assembler, unskilled and light; cashier, semi-skilled and light; and stock clerk, unskilled and light. (Tr. at 91.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, able to perform light work with a sit/stand option allowing the person to change positions at will provided she was not off task more that 10% of the work period; could never climb ladders, ropes, or scaffolds; with frequent balancing with a hand held assistive device.

8

The VE testified that such a person could not perform plaintiff's past work but could do other jobs, including order clerk, call out operator, and surveillance system monitor, all of which were sedentary jobs. (Tr. at 92-93.)

Plaintiff's lawyer asked a hypothetical – using Dr. Myers's April 2011 report as a guide – assuming a person who would be absent more than three times per month. The VE explained that this would eliminate work in the competitive labor market. (Tr. at 94.) If the person were limited to sedentary work and could stand/walk four hours and sit two hours per workday, they could not work full-time, as required by social security regulations. (Tr. at 94-95.) If the person were limited to sedentary work, with a sit/stand option; using a cane while standing/walking; with no twisting, bending, crouching or climbing of ladders; only occasionally climbing stairs; no exposure to extreme cold, heights or hazards; and no concentrated exposure to wetness or humidity, she could perform the three sedentary jobs the VE referenced. (Tr. at 95.) If that same person had to lie down every thirty minutes, for at least a minute or two, that would eliminate work in the competitive labor market. (Tr. at 96.)

**C.    ALJ's Decision**

On October 28, 2011, the ALJ issued an unfavorable decision. Following the SSA's five-step test for determining disability, the ALJ found at step one that plaintiff had not worked at the level of substantial gainful activity since July 22, 2010, the alleged onset date, and at step two that she suffered from the severe impairment of sacroilitis. (Tr. at 16-17.) The ALJ found plaintiff's left knee problems non-severe, as she appeared to recover well following her surgery. The ALJ also found plaintiff's depression non-severe, as it caused no more than minimal limitation in her ability to perform basic mental work activities. (Tr. at 17.) At step three, the ALJ found that plaintiff's impairment did not qualify as conclusively disabling, specifically

considering Listing 1.02. (Tr. at 18.)

The ALJ then determined that plaintiff retained the RFC to perform sedentary work, with a sit/stand option allowing her to sit or stand alternatively at will provided she was not off task more than 10% of the work period. The ALJ further found that she could not climb ladders, ropes, or scaffolds, and required frequent balancing with a handheld assistive device. (Tr. at 18.) In making this finding, the ALJ rejected plaintiff's complaints of disabling pain, noting that she had received only conservative treatment, objective test results were consistently unremarkable, she took narcotic pain medication only on an as needed basis, she continued to work part-time after the alleged onset date, and the medical records noted inconsistencies between plaintiff's presentation and her claimed symptoms. In sum, the ALJ found that while plaintiff's sacroilitis could reasonably be expected to cause some pain, plaintiff described a marked degree of limitation inconsistent with the overall evidence of record. (Tr. at 21.) The ALJ also considered the medical opinions in the record, generally rejecting the opinions of plaintiff's treating physicians as inconsistent with the overall objective medical evidence, and instead crediting the reports of the state agency consultants. (Tr. at 22.)

Based on this RFC, the ALJ determined at step four that plaintiff could not perform any past relevant work, relying on the VE's testimony that plaintiff's previous jobs exceeded the RFC. (Tr. at 22-23.) Finally, at step five, the ALJ concluded that plaintiff could perform other jobs, as identified by the VE, including order clerk, call out operator, and surveillance system monitor. (Tr. at 23-24.) He therefore found her not disabled. (Tr. at 24.)

## II. DISCUSSION

**A.     Standard of Review**

The court reviews an ALJ's decision to ensure that it is based on the correct legal standards and supported by "substantial evidence." Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). Evidence is "substantial" if a reasonable person could accept it as adequate to support the decision. Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012). While the reviewing court may not re-weigh the evidence or substitute its judgment for that of the ALJ, it must nonetheless conduct a critical review of the record, ensuring that the ALJ adequately discussed the issues and built an accurate and logical bridge from the evidence to his conclusion. McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011). The ALJ need not mention every snippet of evidence in the record, but he may not ignore significant evidence contrary to his conclusions. Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012). Finally, because the court confines its review to the rationale offered by the ALJ, Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011), the Commissioner's lawyers may not supplement a deficient analysis, see, e.g., Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010).

**B.     Analysis**

Plaintiff argues that the ALJ failed to consider her S1 radiculopathy, as revealed on the May 25, 2011 EMG. She contends that this failure infected the ALJ's evaluation of the severity of her impairment and the credibility of her claims. I agree.

Generally, the court reviews an ALJ's credibility determination deferentially, reversing only if it is patently wrong. However, where the credibility determination is based on objective factors rather than subjective considerations, the court has greater freedom to review the ALJ's

11

decision. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). Further, "an ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009) (citing SSR 96-7p).

In rejecting plaintiff's complaints of disabling pain, the ALJ repeatedly stressed the lack of objective medical findings, including plaintiff's "normal" lumbar MRI. (Tr. at 19, 20, 21, 22.) However, had he considered it, the ALJ may have determined that the May 2011 EMG provided the missing "objective" support for plaintiff's pain complaints. The Commissioner responds that one diagnostic study cannot alone establish disability, but plaintiff does not argue that it does. Rather, her contention is that the ALJ ignored important evidence undercutting the primary basis for his decision. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004); see, e.g., Hamlin v. Barnhart, 365 F.3d 1208, 1222 (10th Cir. 2004) (reversing where the ALJ cited the absence of diagnostic tests but overlooked EMG findings indicating radiculopathy).

The Commissioner notes that all of the straight leg raise tests yielded negative results for radiculopathy. However, even if these tests provide a basis for rejecting the EMG, the ALJ did not rely on them, and my review is limited to the reasons he supplied. See Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002). The Commissioner also notes the other reasons the ALJ provided for rejecting plaintiff's claims: her conservative treatment (with which she sometimes failed to follow through); the notes from providers that she may have been exaggerating her symptoms; her continued part-time work after the alleged onset date; and her "true motivation" for seeking benefits (i.e., the refusal of her previous employer to rehire her

with her restrictions). Perhaps the ALJ will on remand conclude that these findings outweigh the EMG evidence, but given the emphasis the ALJ placed on the absence of objective test results I cannot be confident of that. See Spiva, 628 F.3d at 353.

Moreover, the EMG test and the subsequent notes from Dr. Zerofsky undercut the ALJ's findings regarding provider skepticism and conservative treatment. For instance, the ALJ relied on Dr. Keehn's refusal to provide stronger pain medication, given the results of his examination. (Tr. at 20.) Specifically, during his April 20, 2011 exam, Dr. Keehn noted plaintiff's "rather dramatic pain behaviors," and he refused to prescribe plaintiff opiates given her normal MRI and the lack of "any abnormalities on an objective basis." (Tr. at 727.) Nevertheless, he decided to obtain an EMG; if the EMG revealed nothing, he would consider a single injection; otherwise, he had no further recommendations for her care. (Tr. at 727.) The EMG was, in fact, abnormal.[5] (Tr. at 770.) Plaintiff thereafter received treatment from Dr. Zerofsky, a neurologist, who recommended a steady increase in Gabapentin to 500 mg four times per day. (Tr. at 744.) However, plaintiff found that the higher dose caused depression and mood swings, causing Dr. Zerofsky to reduce the Gabapentin and prescribe Vicodin, the only thing that helped her pain.[6] (Tr. at 751, 793, 796.)

---

[5]As plaintiff notes, this was not the only time providers expressed skepticism regarding her pain complaints, only to have later objective testing substantiate her claims. For instance, on April 22, 2010, a nurse practitioner responded to plaintiff's complaint of left knee pain by stating: "She has been known to me, and seems to get a joint ache or pain along the way very often with 'work situations.'" (Tr. at 499.) However, an MRI performed four days later revealed a meniscal tear, for which Dr. Beck performed surgery.

[6]The Commissioner questions the veracity of plaintiff's claimed side effects from the Gabapentin. But the ALJ did not question these claims (or discuss these records at all), and in reviewing an ALJ's decision I consider the reasons he provided, not any post-hoc reasoning from the Commissioners' lawyers. See Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012).

The other reasons the ALJ provided seem weak. That plaintiff continued to work post-onset, one day per week for three hours (Tr. at 87), hardly undercuts her claim of disability. See Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) ("[W]e are hard-pressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations."). Further, as plaintiff indicated in a pre-hearing submission, this employer allowed her to sit or rest whenever she needed to. "They are a very understanding employer." (Tr. at 295.) Work for a benevolent person who tolerates frequent breaks and absences that an ordinary employer would find unacceptable does not contradict a claim of disability. Larson v. Astrue, 615 F.3d 744, 752 (7th Cir. 2010). In any event, plaintiff testified that eventually she had to quit even this extremely part-time job because she "couldn't stand or sit any longer." (Tr. at 73-74.)

This leaves the ALJ's suggestion that plaintiff claimed disability, not because of her impairment, but because her previous employer did not have any positions within her restrictions. (Tr. at 21.) Plaintiff's doctors restricted her to working for two hours before she had to take a lengthy break (Tr. at 644), a restriction inconsistent with the full-time work schedule required by social security regulations. See SSR 96-8p; Day v. Astrue, 334 Fed. Appx. 1, 7 (7th Cir. 2009). The ALJ noted that plaintiff had not looked for other work, but this contradicted his previous finding that plaintiff's continued part-time work suggested that she was more capable than she let on.[7]

Plaintiff further argues that the ALJ failed to provide good reasons for discrediting her

---

[7] The Commissioner contends that plaintiff's true motivation for seeking benefits was also revealed by her request that Dr. Myers intervene against her electric company's attempt to shut off her power for non-payment, which he declined to do. Again, my review is limited to the reasons set forth in the ALJ's opinion.

14

doctors' opinions. I again agree. In addition to failing to consider whether the EMG provided objective support for the doctors' reports, the ALJ failed to follow the regulations for evaluating such evidence.

The medical opinion of a social security claimant's treating physician is entitled to "special significance." SSR 96-8p. Such an opinion must be given "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). Treating source reports that do not meet the test for controlling weight are still entitled to deference and must be weighed using a checklist of factors, see SSR 96-2p, including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(c)(2); Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. The ALJ must always provide "good reasons" for discounting the opinion of a treating physician. 20 C.F.R. § 404.1527(c)(2); Scott, 647 F.3d at 739.

In the present case, the ALJ stated:

> I give some weight to the medical source statement of record dated April 7, 2011. However, the signature on this document is illegible. Accordingly, I am unable to ascertain the treating relationship and length of treatment the signer had with the claimant. However, certain opinions in this document are consistent with and support by the overall evidence and I, therefore, give it some weight.

(Tr. at 22.) While the signature on this report is indeed illegible – and the form contains no printed name – the medical records make clear that this report came from treating source Dr. Myers. Specifically, Dr. Myers's April 7, 2011, treatment note indicates that plaintiff needed a

15

form for her disability claim, which he completed. (Tr. at 715-16.) Moreover, during the hearing plaintiff's counsel questioned the VE with the limitations in this report, telling the ALJ that they came from Dr. Myers.[8] (Tr. at 95-96.) The ALJ's failure to recognize the source of this report made it impossible for him to properly analyze the report under the regulatory factors. Further, the ALJ failed to specify which opinions in the report were consistent with the evidence and which were not, and why. See Eakin v. Astrue, 432 Fed. Appx. 607, 612 (7th Cir. 2011) ("An ALJ who declines to give controlling weight to the opinion of a treating physician must offer 'good reasons' that are 'sufficiently specific' in explaining what weight, if any, she assigned it.").

> The ALJ next stated:
>
> I also give little weight to the opinion of Dr. Nalina Sehgal restricting the claimant to work that allows her to work for two hours on, then two hours off, as well [as] the work restrictions placed on the claimant by Dr. Bryan Myers that the claimant is [restricted] to working for two hours followed by a fifteen minute [break] before resuming work for another two hours. Though both [of] these individuals are entitled to controlling weight due to their treatment relationship with the claimant, I find that their opinions relating to the claimant's ability to work are not supported by the objective medical evidence and are therefore given little weight.

(Tr. at 22.) Again, in addition to overlooking the EMG evidence, which may have afforded the missing objective medical support, the ALJ failed to provide the specific reasons required by the regulations. See SSR 96-2p (stating that an unfavorable "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the

---

[8]The Commissioner agrees that Dr. Myers most likely completed this form. (Def.'s Br. [R. 15] at 29.)

reasons for that weight").[9]

Finally, the ALJ gave "no weight to the opinion of Ronald A. Zerofsky, M.D. that the claimant 'is currently disabled because of the pain.' Based on the regulations, a finding of disability is a matter reserved to the Commissioner." (Tr. at 22.) While the regulations provide that an opinion on an issue reserved to the Commissioner is not entitled to controlling weight or special significance, 20 C.F.R. § 404.1527(d), that is "not the same thing as saying that such a statement is improper and therefore to be ignored." Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012). The ALJ must still consider Dr. Zerofsky's opinion, as well as the course of treatment he provided, as discussed above.

The ALJ decided to give "some weight" to the "opinions of the state agency medical consultants who are licensed medical professionals, reviewed a substantial portion of the medical evidence and are specially trained in assessing impairments. However, evidence received at the hearing level shows that claimant is more limited than they determined." (Tr. at 22.) State agency medical consultants are indeed "experts in the Social Security disability programs," SSR 96-6p, but the regulations further provide that the ALJ should consider "the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. 20 C.F.R. § 404.1527(e)(2)(ii). Here, the ALJ failed to consider the other regulatory factors. Further, the consultants' reports issued before plaintiff's May 2011 EMG and subsequent treatment, which may undermine their

---

[9]In her brief, the Commissioner devotes several pages to explaining why the reports from Drs. Myers and Sehgal were not supported by the objective evidence (Def.'s Br. [R. 15] at 28-31), again in defiance of the Chenery doctrine. See Spiva, 628 F.3d at 348.

persuasiveness.

## III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that this matter is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of July, 2013.

<u>s/ Lynn Adelman</u>
LYNN ADELMAN
District Judge